1
2
3
4
5
6
7            **IN THE UNITED STATES DISTRICT COURT**

8            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

9

10   NORMAN FENN JR.,                              CASE NO. CV F 10-1507 LJO SMS

11              Plaintiff,                         **SUMMARY JUDGMENT DECISION**
                                                   (Doc. 21.)
12        vs.

13   PENSKE LOGISTICS, INC., et al.,

14              Defendants.
     _____/
15

16                          **INTRODUCTION**

17        Defendants Penske Logistics, LLC ("Penske Logistics") and Penske Truck Leasing Co., L.P.

18   ("PTL") seek summary judgment on plaintiff Norman Fenn, Jr.'s ("Mr. Fenn's") disability,

19   discrimination and retaliation claims in the absence of Mr. Fenn's disability to preclude him from work.

20   Mr. Fenn contends that his hernia constituted a disability to support his claims. This Court considered

21   Penske Logistics and PTL's (collectively "defendants'") summary judgment motion on the record

22   without a hearing, pursuant to Local Rule 230(g).[1]  For the reasons discussed below, this Court

23   GRANTS defendants summary judgment.

24   _____

25        [1]      This Court carefully reviewed and considered the record, including all evidence, arguments, points and
     authorities, declarations, testimony, statements of undisputed facts and responses thereto, objections and other papers filed
     by the parties. Omission of reference to evidence, an argument, document, objection or paper is not to be construed to the
26   effect that this Court did not consider the evidence, argument, document, objection or paper. This Court thoroughly reviewed,
     considered and applied the evidence it deemed admissible, material and appropriate for summary judgment. This Court does
27   not rule on objections in a summary judgment context, unless otherwise noted. This Court agrees with defendants that Mr.
     Fenn offers many "factual assertions without citing any evidence in the record."

28

                                              1

**BACKGROUND**

**Summary**

Mr. Fenn worked as a Penske Logistics' truck driver for more than 20 years prior to his May 29, 2009 termination.  Mr. Fenn suffered a hernia, which he contends is a disability under the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code, §§ 12900, et seq.  Mr. Fenn pursues FEHA claims for failure to engage in an interactive process and to accommodate Mr. Fenn's disability, disability discrimination, and retaliation for Mr. Fenn's accommodation request.  Defendants contend that Mr. Fenn's claims fail in the absence of evidence that Mr. Fenn's hernia constitutes a FEHA disability or that Mr. Fenn provided medical support for an accommodation.  Defendants further contend that Mr. Fenn violated a forklift use prohibition to establish a legitimate, nondiscriminatory reason to terminate Mr. Fenn without pretext for discrimination or retaliation.  Defendants contest Mr. Fenn's punitive damages claims in the absence of evidence of malicious, oppressive or fraudulent conduct or that a managing agent was involved in his termination.

**Mr. Fenn's Penske Logistics Employment**

During September 19, 1998 to May 29, 2009, Mr. Fenn worked in Fresno as a truck driver for Penske Logistics' Mission Foods account.  Mr. Fenn held a Class 1, commercial license and drove an 18-wheel truck for Penske Logistics.

Mr. Fenn transported loaded pallets of Mission Foods' products, which weighed 300-2,000 pounds, to satellite warehouses from the Fresno distribution center.  Mission Foods' workers loaded the pallets onto Mr. Fenn's truck.  Mr. Fenn unloaded the pallets with a forklift or pallet jack at the warehouses and loaded onto his truck and returned to the Fresno distribution center empty trays stacked on pallets which at times weighed more than pallets loaded with food products.  At times, pallets were double-stacked, that is, stacked on top of one another.

Mr. Fenn drove food products to Sacramento and Bakersfield and testified in his deposition that he liked those routes.  Mr. Fenn often delivered food products at night and testified that no person from Penske Logistics management or human resources was present at his deliveries.

During September 2006 to Mr. Fenn's May 29, 2009 termination, Mr. Fenn maintained a U.S. Department of Transportation ("DOT") medical card, which requires a biannual medical evaluation.

**Mr. Fenn's Supervisors**

Mr. Fenn's direct supervisors were Operations Manager Jeff Rheault ("Mr. Rheault") and Senior Operations Supervisor Gilbert Zayas ("Mr. Zayas"). Mr. Rheault was the most senior manager at Penske Logistic's Fresno location and was responsible for its day-to-day operations. Mr. Zayas was responsible to assign schedules and dispatch drivers. Although Mr. Rheault and Mr. Zayas had authority to discipline employees, neither had authority to terminate an employee in that such authority rested with the human resources department, according to Penske Logistics Human Resources Manager Santos Vicuna ("Mr. Vicuna"). Mr. Rheault reported to and took orders from a regional operations manager and/or a general manager who in turn reported to a vice president or senior vice president. Mr. Zayas reported to Mr. Rheault.

**Mr. Fenn's Hernia**

In 2006, Mr. Fenn was diagnosed with a small umbilical hernia but elected to defer surgery. By October 2008, the hernia had grown to the point where, using Mr. Fenn's words, it "started bothering me kind of regularly. It had gotten bigger to where you could actually kind of really see it and poke it." When asked to describe his hernia, Mr. Fenn testified:

> Some days I didn't feel anything at all. It was just like everything was fine. Other days it would . . . you would feel some pain. . . . I never really felt any doubling over pain. And sometimes it felt like a knot, like you know if you get a Charley horse, after the pain goes away, it's kind of like a knot for a day or so.

Mr. Rheault testified that Mr. Fenn first mentioned his hernia in February or March 2009 and presented no medical records or a doctor's note at that time. Mr. Rheault testified he lacked information that the hernia affected Mr. Fenn's job abilities and that Mr. Fenn "wasn't sure when it happened, how it happened, or where it happened." As such, Mr. Rheault testified that he did not instruct Mr. Fenn to seek medical attention because "it was not determined to be work related."

Mr. Fenn wrote a February 16, 2009 letter addressed "To Whom It May Concern" which stated:

> We started pulling pallets without power about five or six months ago, and it [hernia] started hurting and it has definitely gotten bigger. In January I went to a primary physician, Dr. O'Meara, and he referred me to a surgeon Dr. Ming Lee. I saw him on the 10th of February and he has scheduled me for surgery on February 26, 2008 [2009].
>
> He told me I would need three to four weeks of recovery time due to the fact that I

1    unload 1000+ pound pallets by hand.[2]

2    Although the February 26, 2009 surgery for Mr. Fenn's hernia was set, Mr. Fenn deferred given

3    uncertainty whether workers' compensation or Mr. Fenn's private health insurance would cover the

4    surgery.[3]

5    During February 10, 2009 to May 26, 2009, Mr. Fenn did not treat with a physician for his

6    hernia.  Mr. Fenn testified:

7       Q.    Between April and May 2009, how did your hernia limit or impact your ability
              to do your job?
8
        A.    I was able to do my job. . . . I used the forklifts at whatever location had a
9             forklift.  If I went somewhere where there was a hand pallet jack, I went ahead
              and unloaded with the hand pallet jack, tried to take my time.  If there was a real
10            large pallet, I might have – may have down stacked a few of them to make it two
              smaller ones if there wasn't a forklift there.
11

12   On May 26, 2009, Mr. Fenn treated with Glenn Fujihara, M.D. ("Dr. Fujihara"), a physician with Penske

13   Logistics' workers' compensation health provider.  Dr. Fujihara returned Mr. Fenn to work with no

14   lifting, pushing or pulling more than 30 pounds and "no driving" under DOT regulations.

15   Prior to May 25, 2009, Mr. Fenn never had provided Penske Logistics documentation of

16   restrictions associated with his hernia.  In his deposition, Mr. Fenn answered "Correct" to the question:

17   "So is it fair to say that you never provided medical documentation about any restrictions associated with

18   your hernia to anyone at Penske prior to May 25, 2009?"  Mr. Fenn claims that at an unspecified time,

19   he had provided Mr. Zayas a document which indicated that he needed surgery.

20                                          **Forklift Prohibition**

21   During 2001-2005, Mr. Fenn received biannual forklift training from a Mission Foods employee

22   and was certified to use a forklift through August 2007.  Thereafter, Penske Logistics found forklift

23   training for drivers cost prohibitive.  In August 2008, a memo was posted to prohibit Penske Logistics'

24   drivers to use forklifts.  Mr. Fenn claims, without providing supporting evidence, that at that time

25   _____

26       [2]    Defendants note an absence of evidence that Penske Logistics received Mr. Fenn's letter.

27       [3]    The record is unclear whether Mr. Fenn filed a workers' compensation claim.  The record suggests that
28   Penske Logistics' workers' compensation administrator had merely investigated Mr. Fenn's hernia and that Mr. Fenn treated
     with physicians with Penske Logistics' workers' compensation health provider.

Mission Foods double-stacked pallets to require forklift use.  Mr. Fenn testified that he inquired of Mr. Rheault about forklift use:

> Q.   What did he say?
>
> A.   Basically, just figure it out, do what you've got to do.  My response was, well, I'm going to use the forklift.  It's the only way I can get it off the truck.

Mr. Fenn further testified that Mr. Rheault "said not to worry about it" and that Mr. Fenn said "I'm just going to keep doing what I've been doing."

In his declaration, Mr. Fenn states:

> In October 2008 I notified Mr. Rheault and indicated to him that I had a hernia and needed to use a forklift in order to perform my assigned job duties.  At that time Mr. Rheault allowed me to use a forklift.  At that time I was told by Mr. Rheault "not to worry about it" and told in substance to 'do what you have to do to get the job done.'

In his deposition, Mr. Fenn testified that in late October or early November 2008, he told Mr. Rheault that "I was using the forklift, that I had continued using the forklift. . . . He said that it was posted that we were not supposed to use the forklifts."

Mr. Fenn testified that during a January 2009 meeting with Mr. Rheault and Mr. Zayas, he discussed his hernia and that Mr. Rheault stated: "I cannot give you specific permission to use the forklift, but do what you've got to do."  Mr. Fenn testified that he told Mr. Rheault that he had operated a forklift.

On April 28, 2009, Penske Logistics conducted a mandatory safety meeting ("April 28 meeting") to address drivers' forklift use.  The April 28 meeting was attended by Mr. Fenn, fellow drivers, and Penske Logistics management, including Mr. Rheault, Mr. Zayas and Penske Logistics General Manager Arthur Van Der Stuyf ("Mr. Van Der Stuyf"), who has overall responsibility for Penske Logistics' Mission Foods account.  At the April 28 meeting, Penske Logistics' management stressed that drivers' forklift use was prohibited and could result in employment termination.

At the April 28 meeting, drivers were required to sign a "Forklift Use Statement" ("forklift use statement"), which defendants characterize as "a strict and blanket prohibition on all forklift use by drivers for Penske's Mission Foods account" and a response to a accident caused when a driver operated a forklift without permission or certification.  On April 28, 2009, Mr. Fenn signed his forklift use

1   statement, which reads:

2   **FORKLIFT USE ACKNOWLEDGMENT: to be signed by Penske Logistics**
    **associate to indicate use of forklifts is prohibited.**

3
4   Operation of a forklift by Mission Foods drivers is strictly prohibited.

5   . . .

6   I, Norm Fenn have read and fully understand the above statements and agree to comply
    with them.  I further understand that a violation of this statement could result in
7   corrective action according to Penske Logistics policy 6-1.2.  (Bold and uppercase in
    original.)

8   Defendants explain that Penske Logistics policy 6-1.2 provides for immediate termination in

9   circumstances, including a "preventable accident."   Mr. Fenn understood that a safety violation,

10  including a preventable accident, could result in immediate termination.

11  In his declaration, Mr. Van Der Stuyf states that the forklift use statement "was to ensure safety

12  and prevent liability for accidents cause [sic] by the operation of forklifts by uncertified drivers" and

13  "applied to all of Penske Logistics' Mission Foods drivers.  All of Penske's Mission Foods drivers were

14  required to sign the Forklift Use Statement."

15  Mr. Van Der Stuyf had prepared an April 13, 2009 memorandum which stated in part:

16  Distributor owned and maintained forklifts are absolutely prohibited from use.

17  Mission Foods owned and maintained forklifts requested for use by a Penske Logistics
    associate must be reviewed case by case by submitting a written request . . . .  This
18  request must be approved and the user properly trained before allowing the use of this
    equipment.

19
20  Alternate methods to load and unload product must be utilized that do not include the use
    of "ride-on" powered industrial trucks.

21  The use of "walk-along" powered pallet jacks is permitted if the associate is properly
    trained according to OSHA regulation 29 CFR 1910.178 and the Penske Logistics
22  Powered Industrial Truck Procedure 6-2.4.

23  Mr. Fenn characterizes the forklift use statement as a "reiteration" of a policy to prohibit use of

24  "vendor forklifts" owned and maintained by and located at vendors outside Mission Foods or Penske

25  Logistics.  Penske Logistics' driver Michael Pritchett ("Mr. Pritchett") testified that the April 28 meeting

26  "had to do with vendor-owned forklifts."  Mr. Fenn testified:

27  Q.      And why do you understand it to be vendor owned?

28  A.      Because that's what Artie [Mr. Van Der Stuyf] said.  Any myself and a few other

6

drivers, we thought, well, okay, whatever, we've never been allowed to use vendor owned forklifts, ever.

. . .

. . . all of us drivers already knew that we couldn't use vendor owned forklifts. So nothing – as far as we were concerned, nothing really changed. As far as I know, no one has ever used a vendor forklift.

Defendants note that the forklift use statement "does not distinguish vendor owned forklifts."

### Mr. Fenn's Subsequent Communications Regarding Forklift Use

A few days after the April 28 meeting, Mr. Fenn met with Mr. Rheault. Mr. Fenn testified that he did not ask Mr. Rheault if he could operate a forklift and "asked if I could continue to work and to do what I got to do to get my job done." Mr. Fenn answered "No" when asked if he "expressly ask[ed] for permission to drive a forklift." Mr. Fenn further testified:

> Q.  But did you ask to continue to use the forklift or did you ask to continue to use the forklift because of your hernia?
>
> A.  . . . Did I specifically say . . . can I use the forklift because of my hernia, I don't remember if I specifically said that. But I asked if I could continue to work or did I need to get a work restriction.

Mr. Rheault testified that he told Mr. Fenn: "Use of the forklift is strictly prohibited." Mr. Rheault "strictly said no" to Mr. Fenn's requests "to look the other way and allow him to use it." Mr. Rheault further testified: "He repeatedly wanted me to look the other way, turn a blank eye. He wanted me to allow him to use it, and I would not allow him to use it. The policy is the policy." At a meeting which Mr. Zayas attended, Mr. Rheault denied Mr. Fenn's request for forklift use. Mr. Rheault further testified that Mr. Fenn "was told multiple times that he cannot violate this policy, he asked multiple times if I could look the other way, and each time I said no, it is not possible. He was told in our safety meeting. He was told in the meeting prior to his termination."

As to addressing Mr. Fenn's hernia, Mr. Rheault testified:

> A.  He mentioned to me that he had a hernia. He was told by myself and by Gilbert [Zayas] in the meeting that he needs to go get a medical examination to determine what that is, and then the restrictions regarding that would be determined by a medical facility. Until then there's nothing I can do. I don't know what his restrictions are. He's telling me one thing. He could tell me anything.

7

1          . . .

2     Q.    At any point after learning about Mr. Fenn's hernia, did [you] ever sit down with
             him and his job description and discuss ways that his work could be modified?
3
       A.    No, because we didn't have any restrictions to go by.
4
           . . .
5
       Q.    After you had knowledge that Mr. Fenn had a hernia, did you undertake any
6             efforts to try to place him in a different position within Penske?

7      A.    No, because he just stated what he had.  There was no evidence of actually
             having one.
8

9          Turning to medical documentation, Mr. Rheault testified: "We would have to look at what the

10   medical report says and what the restrictions are.  Then we'd have to make a determination through our

11   departments on if we can accommodate those restrictions and allow him to continue to work."

12                    **Mr. Fenn's Continued Forklift Use And Termination**

13         After signing the forklift use statement, Mr. Fenn continued to operate a forklift "[e]very day I

14   worked."  Mr. Fenn testified that he did not report other drivers whom he observed use a forklift.  Mr.

15   Rheault testified that although there were rumors that drivers continued to use forklifts, "[w]e've asked

16   who, when, where.  No information was given."

17         On May 24, 2009, Mr. Fenn operated a forklift which malfunctioned to require repair ("May 24

18   incident").  Mr. Fenn testified that the "cage which holds the forks of the forklift came off the track when

19   I was unloading with a pallet."  In his declaration, Mr. Fenn states that the forklift "malfunctioned during

20   normal operation" and "did not collide with any object, thing or vehicle."  Mr. Fenn characterizes the

21   forklift damage as minimal and easily repaired.  Mr. Fenn further declares: "After that occurred I moved

22   pallets with a pallet jack as well as I could.  While doing so I aggravated my hernia, reported that fact

23   and the malfunction to my supervisor and was sent home for the day."

24         Mr. Fenn telephoned Mr. Zayas to report the May 24 incident.  Mr. Zayas suspended Mr. Fenn

25   pending an investigation.

26         On May 29, 2009, Mr. Rheault called Mr. Fenn into his office and informed Mr. Fenn that Mr.

27   Fenn was terminated for violating the forklift use statement.  Human Resources Manager Mr. Vicuna

28   declares that Penske Logistics' human resources authorized Mr. Fenn's termination.

                                                    8

Penske Logistics Human Resource Manager Trang Bach ("Ms. Bach") testified that she was authorized to terminate Penske Logistics employees in Fresno and made the decision to terminate Mr. Fenn based on Mr. Fenn's signed forklift use statement and written statements of Mr. Rheault and Mr. Zayas.  Ms. Bach did not interview Mr. Fenn. Ms. Bach testified:

> Q. When Jeff Rheault contacted you, what did he say?
>
> A. He said that Mr. Fenn attended a meeting, signed a document that there – he should not use the forklift, and he actually called Jeff and asked him specifically for permission to use the forklift, and Jeff said no, and that he still did it.

Regarding his termination, Mr. Fenn testified:

> Q. Throughout this process, throughout the end of your employment at Penske, did you feel that you had been discriminated against?
>
> A. Yes, I felt that – I mean, you know, what was the reason?  You know, obviously for some reasons they wanted to fire me.
>
> Q. What makes you believe that that reason was your hernia?
>
> A. It doesn't make me believe that the reason was my hernia.  It makes me wonder why they wanted to fire me, you know. . . . At the time I was terminated, I didn't think that it was, oh, this is for my hernia.

Mr. Fenn notes that after his termination, the effects of the forklift use statement were changed to allow drivers to use forklifts to remove double-stacked pallets which were difficult to move without a forklift.

Mr. Rheault testified that he did not discuss Dr. Fujihara's May 26, 2009 restrictions with Mr. Fenn in that "[t]here was no need. . . . He was being terminated."  Defendants attribute Mr. Fenn to admit that he never provided documentation of hernia limitations prior to his discipline for violating the forklift use statement.

## Mr. Fenn's Claims

Mr. Fenn proceeds on this Complaint for Damages ("complaint") to allege against defendants FEHA claims that defendants failed to engage in an interactive process and denied Mr. Fenn's reasonable accommodation, discriminated against Mr. Fenn based on his disability and retaliated against Mr. Fenn for seeking a reasonable accommodation.  The complaint alleges that Mr. Fenn was terminated on pretext of prohibited forklift use.  The complaint seeks recovery for Mr. Fenn's emotional distress, lost wages and fringe benefits, and punitive damages.

1

**DISCUSSION**

2

**Summary Judgment Standards**

3       Defendants seek summary judgment in that Mr. Fenn's claims are "deficient as a matter of law"

4   in the absence of evidence that "his hernia constitutes a disability," that violation of the forklift use

5   statement is a pretext for discrimination, and that a managing agent was involved in his termination to

6   support punitive damages.  Mr. Fenn argues that he "properly reported his disability" and was given

7   "tacit permission to continue to use the forklift" to render justifications for his termination as

8   "pretextual."

9       F.R.Civ.P. 56(a) permits a party to seek summary judgment "identifying each claim or defense

10   – or the part of each claim or defense – on which summary judgment is sought."  "A district court may

11   dispose of a particular claim or defense by summary judgment when one of the parties is entitled to

12   judgment as a matter of law on that claim or defense." *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st

13   Cir. 1999).

14       Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any

15   material fact and the movant is entitled to judgment as a matter of law."  F.R.Civ.P. 56(a); *Matsushita*

16   *Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv.,*

17   *Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The purpose of summary

18   judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need

19   for trial." *Matsushita Elec.*, 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers*

20   *v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

21       On summary judgment, a court must decide whether there is a "genuine issue as to any material

22   fact," not weigh the evidence or determine the truth of contested matters.  F.R.Civ.P. 56(a), (c); *Covey*

23   *v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*,

24   398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82

25   S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir.

26   1984).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

27   inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for

28   summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106

1  S.Ct. 2505 (1986)

2         The evidence of the party opposing summary judgment is to be believed and all reasonable

3  inferences that may be drawn from the facts before the court must be drawn in favor of the opposing

4  party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.  The

5  inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or

6  whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-

7  252, 106 S.Ct. 2505.

8         To carry its burden of production on summary judgment, a moving party "must either produce

9  evidence negating an essential element of the nonmoving party's claim or defense or show that the

10  nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of

11  persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th

12  Cir. 2000); *see Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (2007) (moving party is able to

13  prevail "by pointing out that there is an absence of evidence to support the nonmoving party's case");

14  *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990).   A

15  "complete failure of proof concerning an essential element of the nonmoving party's case necessarily

16  renders all other facts immaterial" to entitle the moving party to summary judgment. *Celotex Corp. v.*

17  *Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).

18         "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the

19  court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech*

20  *Gays*, 895 F.2d at 574.  "As to materiality, the substantive law will identify which facts are material.

21  Only disputes over facts that might affect the outcome of the suit under the governing law will properly

22  preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

23         "If a moving party fails to carry its initial burden of production, the nonmoving party has no

24  obligation to produce anything, even if the nonmoving party would have the ultimate burden of

25  persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598.

26  "If, however, a moving party carries its burden of production, the nonmoving party must produce

27  evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d

28  at 574.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material

1  fact, the moving party wins the motion for summary judgment."  *Nissan Fire*, 210 F.3d at 1103; *see*

2  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) (F.R.Civ.P. 56 "mandates the entry

3  of summary judgment, after adequate time for discovery and upon motion, against a party who fails to

4  make the showing sufficient to establish the existence of an element essential to that party's case, and

5  on which that party will bear the burden of proof at trial.")

6      "But if the nonmoving party produces enough evidence to create a genuine issue of material fact,

7  the nonmoving party defeats the motion."  *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322,

8  106 S.Ct. 2548.  "The amount of evidence necessary to raise a genuine issue of material fact is enough

9  'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"  *Aydin Corp.*

10  *v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-

11  289, 88 S.Ct. 1575, 1592 (1968)).  "The mere existence of a scintilla of evidence in support of the

12  plaintiff's position will be insufficient."  *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

13      As discussed below, Mr. Fenn fails to raise factual issues to avoid summary judgment on his

14  claims.

15                                    **Claims Against PTL**

16      PTL seeks summary judgment in that PTL "had no involvement with Plaintiff, his employment

17  or his termination."

18      Penske Logistics Human Resources Manager Mr. Vicuna declares that PTL never employed Mr.

19  Fenn and "had no involvement with the terms of Plaintiff's employment or Plaintiff's termination" and

20  that PTL "is a separate company from Penske Logistics."  Penske Logistics General Manager Mr. Van

21  Der Stuyf echoes that PTL "is a separate company from Penske Logistics" and "had nothing to do with

22  the Forklift Use Statement and/or Penske Logistics' policy to prohibit drivers for Penske Logistics'

23  Mission Foods account from operating forklifts."

24      PTL points to the absence of evidence that Mr. Fenn communicated with anyone at PTL "let

25  alone about his hernia or forklift use," that Mr. Fenn requested PTL to provide a reasonable

26  accommodation, or that PTL "had anything to do with the terms of Plaintiff's employment or

27  termination."

28      Mr. Fenn acknowledges that defendants' claim that PTL "is not a proper party is likely well

                                          12

taken." Mr. Fenn offers nothing to support a claim against PTL. The record demonstrates nothing to support Mr. Fenn's claims against PTL to warrant summary judgment in PTL's favor.

### FEHA Disability

Defendants contend that Mr. Fenn's hernia is not a FEHA disability to result in an absence of an essential element for his FEHA claims.

FEHA defines "physical disability" to include a "condition" which affects the "musculoskeletal" system and "[l]imits a major life activity." Cal. Gov. Code, § 12926(k)(1). "The threshold question in a FEHA action is whether the plaintiff's qualifying medical condition '[l]imits a major life activity.'" *EEOC v. United Parcel Service, Inc.*, 424 F.3d 1060, 1069 (9th Cir. 2005) (quoting Cal. Gov. Code, § 12926(k)(1)(B)). Under FEHA, "'working' is a major life activity, regardless of whether the actual or perceived working limitation implicates a particular employment or a class or broad range of employments." Cal. Gov. Code, § 12926.1(c).

"FEHA does not require that the disability result in utter inability or even substantial limitation on the individual's ability to perform major life activities. A limitation is sufficient." *United Parcel Service,* 424 F.3d at 1071 (9th Cir. 2005) (internal citation omitted).

#### *Ability To Perform Penske Logistics Job*

Defendants argue that Mr. Fenn's hernia is not a FEHA disability because "it did not limit the major life activity of working" or "his ability to perform the functions of his specific position with Penske." Defendants point out that Mr. Fenn performed his driver functions "without using a forklift (of any accommodation)." Defendants note that prior to the May 24 incident and Mr. Fenn's suspension, Mr. Fenn provided no work restrictions to Penske Logistics.

Defendants point to Mr. Fenn's acknowledgment that he could perform as a truck driver: "I was able to do my job. . . . I used the forklifts at whatever location had a forklift. If I went somewhere where there was a hand pallet jack, I went ahead and unloaded with the hand pallet jack, tried to take my time. If there was a real large pallet, I might have – may have down stacked a few of them to make it two smaller ones if there wasn't a forklift there." Defendants further point to Mr. Fenn's testimony of limited pain or discomfort: "Some days I didn't feel anything at all. It was just like everything was fine. Other days it would . . . you would feel some pain. . . . I never really felt any doubling over pain. And

1   sometimes it felt like a knot, like you know if you get a Charley horse, after the pain goes away, it's kind

2   of like a knot for a day or so." Defendants contend that "there is simply no basis for a finding that

3   Plaintiff could not perform his driver job because of his hernia."

4       Mr. Fenn fails to address meaningfully that his hernia constituted a FEHA disability. Mr. Fenn

5   notes that he "perceived his physical condition as a 'disability' that limited his ability to perform his

6   work and informed his employer about it." Mr. Fenn focuses on his communications with Mr. Rheault

7   and Mr. Zayas during which he merely noted his hernia and ability to work. Mr. Fenn fails to

8   demonstrate that prior to the May 24 incident, his hernia constituted a disability to limit a major work

9   activity. Mr. Fenn's communications that he had a hernia and used a forklift are not evidence of

10  disability. In fact, Mr. Fenn acknowledged he could engage in major life activities, including

11  performance of his job. Mr. Fenn raises no factual issue regarding existence of a FEHA disability.

12                          ***Ability To Perform Other Work***

13      Defendants also point to an absence of evidence of Mr. Fenn's inability to perform as a Class 1,

14  DOT certified driver for an employer other than Penske Logistics. Courts "have consistently declined

15  to provide statutory protection to persons whose conditions have rendered them unable to meet their

16  employer's requirements for a particular job, but who are otherwise physically able to work elsewhere

17  in their chosen profession." *Maloney v. ANR Freight System, Inc.*, 16 Cal.App.4th 1284, 1286, 20

18  Cal.Rptr.2d 656 (1993). Defendants note an absence of evidence that Mr. Fenn's hernia precluded

19  another driver position that permitted forklift use or that transports lighter and/or smaller loads to obviate

20  forklift use. Defendants conclude that Mr. Fenn is unable to demonstrate his preclusion "from all Class

21  1 driving positions and/or driving positions that required DOT certification."

22      Mr. Fenn offers no meaning support of his inability to perform another driver's job. The absence

23  of such inability further bolsters Mr. Fenn's lack of a FEHA disability.

24                      **Discrimination And Retaliation**

25      The complaint's (third) disability discrimination claims alleges that defendants "discriminated

26  against Fenn because of his physical condition and physical disability in terminating him because of that

27  condition."

28      FEHA declares "as a public policy of this state that it is necessary to protect and safeguard the

                                      14

right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of . . . physical disability . . . medical condition . . ." Cal. Gov. Code, § 12920. California Government Code section 12940(a) deems unlawful: "For an employer, because of . . . physical disability . . . medical condition . . . to discharge the person from employment . . . or to discriminate against the person in compensation or in terms, conditions, or privileges of employment."

The complaint's (fourth) retaliation claim alleges that Mr. Fenn was subjected to unlawful retaliation because he requested a reasonable accommodation and objected to discriminatory treatment arising from his physical disability and medical condition. The claim alleges that retaliation "consisted of denying Fenn continued reasonable accommodation forcing him to remain off work."

California Government Code section 12940(h) renders unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." California Government Code section 12940(h) "incorporates other unlawful employment practices defined in other parts of section 12940, and forbids retaliation against anyone opposing any such unlawful employment practice." *Jones v. Lodge at Torrey Pines Partnership*, 42 Cal.4th 1158, 1164, 72 Cal.Rptr.3d 624 (2008).

### *Prima Facie Case*

Elements of a prima facie case of disability discrimination are that the plaintiff:

1.   Suffers from a disability;

2.   Is otherwise qualified to perform his/her job; and

3.   Was subjected to adverse employment action because of the disability.

*Faust v. California Portland Cement Co.*, 150 Cal.App.4th 864, 886, 58 Cal.Rptr.3d 729 (2007); *Brundage v. Hahn*, 57 Cal.App.4th 228, 236, 66 Cal.Rptr.2d 830, 835 (1997); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802; 93 S.Ct. 1817 (1973); *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 891 (9th Cir. 1994); *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338, 1343 (9th Cir. 1987), *cert. denied*, 484 U.S. 1047, 108 S.Ct. 785 (1988).

To make out a retaliation prima facie case, a plaintiff must demonstrate that:

1.   He/she engaged in protected activity;

1    2.    He/she suffered an adverse employment action; and

2    3.    There was a causal link between his/her activity and the employment action.

3  *Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1065-1066 (9th Cir. 2003); *Yanowitz v. L'Oreal*

4  *USA, Inc.*, 36 Cal.4th 1028, 1042, 116 P.3d 1123 (2005); *Fisher v. San Pedro Peninsula Hosp.*, 214

5  Cal.App.3d 590, 615, 262 Cal.Rptr. 842 (1989).

6                                    ***Burden Shifting Framework***

7         For FEHA discrimination and retaliation claims at issue here, the *McDonnell Douglas*[4] burden-

8  shifting framework applies in the absence of direct evidence of discrimination or retaliation.  *Metoyer*

9  *v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007); *Miller v. Fairchild Industries, Inc.*, 797 F.2d 727, 730-

10 731 (9th Cir. 1986) (order and allocation of proof for retaliation claims follow familiar scheme

11 announced in *McDonnell Douglas*).  "At the first step of *McDonnell Douglas*, the plaintiff must establish

12 a prima facie case of discrimination or retaliation."  *Metoyer*, 504 F.3d at 931, n. 6.  "If the plaintiff

13 makes out her prima facie case of either discrimination or retaliation, the burden then 'shifts to the

14 defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory [or

15 retaliatory] conduct.'"  *Metoyer*, 504 F.3d at 931, n. 6 (quoting *Vasquez v. County of Los Angeles*, 349

16 F.3d 634, 640 (9th Cir. 2003)); *see Scotch v. Art Institute of California-Orange County, Inc.*, 173

17 Cal.App.4th 986, 1020, 93 Cal.Rptr.3d 338 (2009).

18        "Finally, at the third step of *McDonnell Douglas*, if the employer articulates a legitimate reason

19 for its action, 'the presumption of discrimination drops out of the picture, and the plaintiff may defeat

20 summary judgment by satisfying the ususal standard of proof required'" under F.R.Civ.P. 56(c)(1).

21 *Metoyer*, 504 F.3d at 931 (quoting *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir.

22 2006) (citations and internal quotation marks omitted)).  "Once an employer satisfies its initial burden

23 of proving the legitimacy of its reason for termination, the discharged employee seeking to avert

24 summary judgment must present specific and substantial responsive evidence that the employer's

25 evidence was in fact insufficient or that there is a triable issue of fact material to the employer's motive."

26 *King v. United Parcel Service, Inc.*, 152 Cal.App.4th 426, 433, 60 Cal.Rptr.3d 359 (2007). If the

27

28        [4]    *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973).

employer carries its burden, plaintiff must have an opportunity to prove by a preponderance of evidence that the legitimate reasons offered by the employer were not its true reasons but were a pretext for discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089 (1981); *McDonnell Douglas*, 411 U.S. at 804; 93 S.Ct. 1817*; see Brundage v. Hahn*, 57 Cal.App. 4th 228, 66 Cal.Rptr.2d 830, 835 (1997).  "If a plaintiff succeeds in raising a genuine factual issue regarding the authenticity of the employer's stated motive, summary judgment is inappropriate, because it is for the trier of fact to decide which story is to be believed." *Washington v. Garrett*, 10 F.3d 1421, 1432-1433 (9th Cir. 1993).

The plaintiff is required to produce "specific, substantial evidence of pretext" to avoid summary judgment. *Collings v. Longview Fibre Co.*, 63 F.3d 828, 834 (9th Cir. 1995), *cert. denied*, 516 U.S. 1048, 116 S.Ct. 711 (1996).  Neither plaintiff's subjective beliefs nor uncorroborated, self-serving declarations create a genuine issue of fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 401 (7th Cir. 1997), *cert. denied*, 523 U.S. 1118, 118 S.Ct. 1795 (1998); *King*, 152 Cal.App.4th at 433, 60 Cal.Rptr.3d 359.  "And finally, plaintiff's evidence must relate to the motivation of the decision makers to prove, by nonspeculative evidence, an actual causal link between prohibited motivation and termination." *King*, 152 Cal.App.4th at 433-434, 60 Cal.Rptr.3d 359.

Despite the burden shifting, the ultimate burden of proof remains always with the plaintiff to show that the employer intentionally discriminated against plaintiff. *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1281 (9th Cir. 2000), *cert denied*, 121 S.Ct. 2592 (2001); *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1420-1421 (9th Cir. 1990), *cert. denied,* 533 U.S. 950, 121 S.Ct. 2592 (2001).

As an alternative to the *McDonnell Douglas* framework, a plaintiff responding to a summary judgment motion "may simply produce direct or circumstantial evidence demonstrating that a discriminatory [or retaliatory] reason more likely than not motivated [the employer]." *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) (citation omitted).  The "*McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613 (1985).

"When the plaintiff offers direct evidence of discriminatory [or retaliatory] motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial. . . . it need be 'very little.'" *Goodwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) (quoting *Lindahl v. Air France*, 930 F.2d 1434, 1438 (9th Cir 1991)).  "Direct evidence is evidence which, if believed, proves the fact [of discrimination or retaliation] without inference or presumption." *Goodwin*, 150 F.3d at 1221 (citation omitted).  "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Coghlan v. American Seafoods Co. LLC.,* 413 F.3d 1090, 1095 (9th Cir. 2005).

### Legitimate, Nondiscriminatory Reasons

To challenge Mr. Fenn's discrimination and retaliation claims, defendants bypass the prima facie cases and focus on legitimate, nondiscriminatory grounds to terminate Mr. Fenn for his "knowing, willful and blatant" violation of the forklift use statement.

If plaintiff establishes a prima facie case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for adverse employment action. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817; *Burdine*, 450 U.S. at 252-253, 101 S.Ct. 1089; *Coleman*, 232 F.3d at 1281; *Guz*, 24 Cal.4th at 355-356, 100 Cal.Rptr. at 379; *Brundage*, 57 Cal.App.4th at 236, 66 Cal.Rptr.2d at 835.

"The defendant's burden at this stage is one of production, not persuasion. The court may not make a credibility assessment." *Njenga v. San Mateo County Superintendent of Schools*, 2010 WL 1261493, at *14 (N.D. Cal. 2010) (citing *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097 (2000)).  "The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. 254, 101 S.Ct. 1089.

Defendants argue that the facts "strongly corroborate the veracity of Penske's legitimate, nondiscriminatory reason for terminating" Mr. Fenn in that the forklift use statement was implemented to ensure safety and prevent liability for accidents caused by uncertified drivers.  Defendants note that the forklift use statement "was not applied differently" to Mr. Fenn and point to General Manager Mr. Van Der Stuyf's declaration that the forklift use statement "applied to all of Penske Logistics' Mission Foods drivers," all of whom "were required to sign" the forklift use statement.  Defendants further

18

explain that given the absence of Penske Logistics management onsite, "no member of Penske management could have observed other drivers using forklifts." Defendants point out that rumors of drivers using forklifts were investigated but not substantiated. Defendants further note Mr. Fenn's denial that he was terminated due to his hernia: "It doesn't make me believe that the reason was my hernia. It makes me wonder why they wanted to fire me, you know. . . . At the time I was terminated, I didn't think that it was, oh, this is for my hernia." Defendants conclude that Mr. Fenn was not treated differently than other drivers, especially given his desired route and schedule.

Mr. Fenn argues that "the rationale for termination has to be seen as pretextual" because of the "home office policy" to authorize "local supervisors" to allow driver forklift use upon "request." Mr. Fenn faults defendants' "failure to point this option out to Fenn or to facilitate his use of it." Mr. Fenn further claims that Mr. Rheault and Mr. Zayas provided "tacit approval to Fenn's use of the forklift" and that defendants failed to follow the "corrective action policy" given that Mr. Fenn did not cause a "preventable accident" since his forklift malfunctioned.

Mr. Fenn offers no meaningful challenge to the grounds to terminate Mr. Fenn. The record establishes that as of April 28, 2009, Penske Logistics' policy was that "[o]peration of a forklift by Mission Foods drivers is strictly prohibited." Mr. Fenn relies on Mr. Van Der Stuyf's April 13, 2009 memorandum which indicates that Mission Foods forklifts requested by a Penske Logistics' driver "must be reviewed case by case by submitting a written request."[5] Mr. Fenn fails to demonstrate that the written request procedure was available, especially given the forklift use statement's subsequent unequivocal prohibition. The inferences suggest that a written request procedure was unavailable in that the later forklift use statement prohibited forklift use. Moreover, Mr. Fenn offers no evidence of his written request for forklift use.

The record fails to demonstrate tacit approval of Mr. Fenn's forklift use after the April 28 meeting. Mr. Fenn testified that after the April 28 meeting, he did not ask Mr. Rheault if he could operate a forklift: "Did I specifically say . . . can I use the forklift because of my hernia, I don't remember if I specifically said that. But I asked if I could continue to work or did I need to get a work

---

[5]   Defendants notes that the April 13, 2009 memorandum is "outdated and unauthenticated." Defendants correctly question the probative value of the April 13, 2009 memorandum.

1   restriction." Mr. Rheault denies giving permission for Mr. Fenn's attempts to evade the forklift use

2   statement.

3          The inferences from the record are that Mr. Fenn continued to perform his job with his hernia,

4   for which he delayed medical attention, and that he violated a clearly expressed prohibition on forklift

5   use, regardless of practices of drivers prior to the April 28 meeting. Mr. Fenn's points as to "corrective

6   action policy" and forklift malfunction are immaterial as the issue is prohibited forklift use as of May

7   24, 2009, not another infraction. Defendants are correct that Mr. Fenn could have prevented malfunction

8   of the forklift by not using it. Defendants substantiate their legitimate, nondiscriminatory grounds to

9   terminate Mr. Fenn who raises no factual issues of pretext.

10                  **Interactive Process And Reasonable Accommodation Claims**

11          The complaint's (first) failure to engage in interactive process claim alleges that defendants failed

12   to explore whether Mr. Fenn "could alter the conditions of his workplace to keep him in his position,

13   or other reasonable good faith and interactive processes that might have allowed a reasonable

14   accommodation to be determined."

15          FEHA renders as an unlawful employment practice an employer's failure "to engage in a timely,

16   good faith, interactive process with the employee or applicant to determine effective reasonable

17   accommodations, if any, in response to a request for reasonable accommodation by an employee or

18   applicant with a known physical or mental disability or known medical condition." Cal. Gov. Code, §

19   12940(n). "An employee may file a civil action based on the employer's failure to engage in the

20   interactive process." *Claudio v. Regents of Univ. of Cal.*, 134 Cal.App.4th 224, 244, 35 Cal.Rptr.3d 837

21   (2005). "The interactive process is triggered either by a request for accommodation by a disabled

22   employee or by the employer's recognition of the need for such an accommodation." *Swonke v. Sprint,*

23   *Inc.*, 327 F.Supp.2d 1128, 1137 (N.D. Cal. 2004). Nonetheless, a court "cannot impose upon the

24   employer an obligation to engage in a process that was guaranteed to be futile." *Swonke*, 327 F.Supp.2d

25   at 1137. "The employer cannot be required to find a job for an employee when no such position could

26   be created even hypothetically." *Swonke*, 327 F.Supp.2d at 1138.

27          The complaint's (second) failure to provide reasonable accommodation claim alleges that

28   defendants failed to provide Mr. Fenn a reasonable accommodation in that Mr. Fenn was not allowed

20

to return to work and thus terminated.

FEHA renders as an unlawful employment practice "[f]or an employer . . . to fail to make reasonable accommodation for the known physical . . . disability of an . . . employee." Cal. Gov. Code, § 12940(m).  To establish a FEHA claim for failure to make reasonable accommodation, a plaintiff must show that, at the time of the alleged failure, (1) he had a disability of which the employer was aware, (2) he was able to perform the essential functions of the job at issue with or without accommodation, i.e., that he was qualified individual, and (3) the employer failed to reasonably accommodate for his disability.  *Jadwin v. County of Kern*, 610 F.Supp.2d 1129, 1175-1176 (E.D. Cal. 2009).

Defendants hold Mr. Fenn "to put the employer on notice of his disability and resulting limitations."  *See Prilliman v. United Air Lines, Inc.*, 53 Cal.App.4th 935, 949-950, 62 Cal.Rptr.2d 142 (internal quotations and citations omitted) ("The duty of an employer reasonably to accommodate an employee's [disability] does not arise until the employer is aware of respondent's disability and physical limitations.  The employee bears the burden of giving the employer notice of the disability.")

In *Scotch v. Art Institute of California-Orange County, Inc.,* 173 Cal.App.4th 986, 1013, 93 Cal.Rptr.3d 338 (2009), the California Court of Appeal explained:

> The interactive process imposes burdens on both the employer and employee. The employee must initiate the process unless the disability and resulting limitations are obvious. "Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, . . . the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." (*Taylor v. Principal Financial Group, Inc.* (5th Cir.1996) 93 F.3d 155, 165.)

"Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA."[6]  *Brundage*, 57 Cal.App.4th at 237, 66 Cal.Rptr.2d 830.  The "employee's failure to provide medical information necessary to the interactive process precludes her from claiming that the employer violated the ADA by failing to provide reasonable accommodation."  *Templeton v. Neodata Services, Inc.*, 162 F.3d 617, 619 (10th Cir. 1998).  "An employee's provision of medical information is an indispensable aspect of that interactive process

---

[6]    The ADA is the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq.  Since FEHA was modeled on the ADA, decisions interpreting the ADA are "useful in deciding cases under the FEHA."  *Prilliman,* 53 Cal.App.4th at 949-950, 62 Cal.Rptr.2d 142.

and where an employee fails to provide documentation sufficient to allow an employer to assess the parameters of the employee's disability, 'ADA liability simply does not follow.'" *Monterroso v. Sullivan & Cromwell, LLP*, 591 F.Supp.2d 567, 579 (S.D.N.Y. 2008).

Defendants argue that the burden shifts to an employer to take "positive steps to accommodate the employee's limitations" only after the employee provides sufficient notice of his/her disability and resulting limitations. *See Prilliman*, 53 Cal.App.4th at 950, 62 Cal.Rptr.2d 142. Defendants characterize as "vague and conclusory" Mr. Fenn's statements to Penske Logistics about continuing to work to render Mr. Fenn's statements "insufficient to trigger Penske's interactive process and reasonable accommodation duties." Defendants point to Mr. Fenn's testimony regarding forklift use: "Did I specifically say . . . can I use the forklift because of my hernia, I don't remember if I specifically said that. But I asked if I could continue to work or did I need to get a work restriction." Mr. Fenn further denied seeking permission to use a forklift and testified: "I asked if I could continue to work and to do what I got to do to get my job done."

Defendants fault Mr. Fenn's failure to present a concise list of restrictions to accommodate his hernia and to identify specifically his disability and resulting limitations. Mr. Fenn admitted: "I was able to do my job. . . . I used forklifts at whatever location had a forklift. If I went somewhere where there was a hand pallet jack, I went ahead and unloaded with the hand pallet jack, tried to take my time. If there was a real large pallet, I might have down stacked a few of them to make it two smaller ones if there wasn't a forklift there."

Mr. Fenn acknowledged that he provided no restrictions associated with his hernia prior to the May 24 incident. Operations Manager Mr. Rheault testified that in the absence of medical documentation, he did not know what Mr. Fenn's restrictions were: "He's telling me one thing. He could tell me anything." Defendants contend that Mr. Fenn's mere statement to Mr. Rheault that Mr. Fenn "had a hernia and wanted to use a forklift" are insufficient to support Mr. Fenn's FEHA interactive process and reasonable accommodation claims. Defendants attribute to Mr. Fenn "vague, self-serving and uncorroborated statements to Penske about 'wanting to continue to work.'" Defendants conclude that Mr. Fenn failed to provide documentation or specification of hernia limitations and likewise failed to trigger FEHA's interactive process and reasonable accommodation requirements.

22

1   Mr. Fenn improperly faults Penske Logistics' failure to initiate the interactive process and to

2   accommodate Mr. Fenn.  Mr. Fenn notes that no one "asked Fenn to provide a doctor's diagnosis or list

3   of restrictions."  Mr. Fenn claims that he "was not prompted to engage in an interactive process."  Mr.

4   Fenn wrongly burdens Penske Logistics to initiate an interactive process and accommodation based on

5   Mr. Fenn's mere reporting of his hernia despite his acknowledgment of ability to perform his job prior

6   to the May 24 incident.

7   Moreover, Mr. Rheault and Mr. Zayas knew only that Mr. Fenn had a hernia and wanted to use

8   a forklift.  Mr. Fenn was subject to no verified restrictions until after he was seen by Dr. Fujihara on May

9   26, 2009, after the May 24 incident.  Prior to the May 24 incident, Mr. Fenn never requested a

10  recognizable accommodation and Mr. Rheault correctly observed "we didn't have any restrictions to go

11  by."  Mr. Fenn's reliance on his purported workers' compensation claim is unavailing in that the record

12  reveals no restrictions from a medical provider until after the May 24 incident.  The record lacks

13  evidence that Mr. Fenn filed a workers' compensation claim.  The record reveals only that he treated

14  with physicians through Penske Logistics' workers' compensations health provider.

15  In sum, defendants are correct that Mr. Fenn's "failure to provide any information to corroborate

16  his self-serving statements regarding his hernia and purported desire to drive a forklift provide[] an

17  additional basis for summary judgment on Plaintiff's interactive process and reasonable accommodation

18  claims."

19  **Punitive Damages**

20  Defendants argue that they are not subject to punitive damages in absence of evidence that a

21  managing agent was involved in Mr. Fenn's employment or termination or that an officer, director or

22  managing agent knowingly ratified malicious, oppressive or fraudulent conduct.

23  ***California General Law***

24  California Civil Code section 3294 ("section 3294") provides that in an action "for breach of an

25  obligation not arising from contract," a plaintiff may seek punitive damages "where it is proven by clear

26  and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  Cal. Civ.

27  Code, § 3294(a).

28  Punitive damages are "available to a party who can plead and prove the facts and circumstances

23

set forth in Civil Code section 3294." *Hilliard v. A.H. Robbins Co.*, 148 Cal.App.3d 374, 392, 196 Cal.Rptr. 117 (1983).  Punitive damages are never awarded as a matter of right, are disfavored by the law, and should be granted with the greatest of caution and only in the clearest of cases.  *Henderson v. Security Pacific National Bank*, 72 Cal.App.3d 764, 771, 140 Cal.Rptr. 388 (1977).

"'Clear and convincing' evidence requires a finding of high probability."  *Mock v. Michigan Millers Mut. Ins.*, 4 Cal.App.4th 306, 332, 5 Cal.Rptr.2d 594 (1992).  The clear and convincing standard requires evidence "'so clear as to leave no substantial doubt'; 'sufficiently strong to command the unhesitating assent of every reasonable mind.'" *Mock*, 4 Cal.App.4th at 332, 5 Cal.Rptr.2d 594 (citations omitted.)

### Managing Agent

Section 3294(b) addresses requirements to impose punitive damages against employers:

> An employer shall not be liable for [punitive] damages . . . based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice.  With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud or malice must be on the part of an officer, director, or managing agent of the corporation.

"While an employer may be liable for an employee's tort under the doctrine of respondeat superior, he is not responsible for punitive damages where he neither directed nor ratified the act."  *Merlo v. Standard Life & Acc. Ins. Co.*, 59 Cal.App.3d 5, 18, 130 Cal.Rptr. 416 (1976).

Section 3294 requires proof of wrongful conduct among corporate leaders: the "officer[s], director[s], or managing agent[s]." Cal. Civ. Code, § 3294(b); *Cruz v. HomeBase*, 83 Cal.App.4th 160, 166, 99 Cal.Rptr.2d 435 (2000).  In *Cruz*, 83 Cal.App.4th at 166-167, 99 Cal.Rptr.2d 435, the California Court of Appeal explained:

> This is the group whose intentions guide corporate conduct. By so confining liability, the statute avoids punishing the corporation for malice of low-level employees which does not reflect the corporate "state of mind" or the intentions of corporate leaders. This assures that punishment is imposed only if the corporation can be fairly viewed as guilty of the evil intent sought to be punished.

"The determination whether employees act in a managerial capacity, however, does not necessarily hinge on their 'level' in the corporate hierarchy."  *Egan v. Mutual of Omaha Ins. Co.*, 24

1  Cal.3d 809, 822, 169 Cal.Rptr. 691 (1979), *cert. denied*, 445 U.S. 912, 100 S.Ct. 1271 (1980).

2  "Managing agents" are employees who "exercise[] substantial discretionary authority over decisions that

3  ultimately determine corporate policy." *White v. Ultramar, Inc.*, 21 Cal.4th 563, 573, 88 Cal.Rptr.2d

4  19 (1999). "'[C]orporate policy' is the general principles which guide a corporation, or rules intended

5  to be followed consistently over time in corporate operations." *Cruz*, 83 Cal.App.4th at 167, 99

6  Cal.Rptr.2d 435.

7     An act of oppression, fraud or malice, by an officer, director or managing agent, is sufficient to

8  impose liability on a corporate employer for punitive damages, without an additional showing of

9  ratification by the employer. Cal. Civ. Code, § 3294(b); *Agarwal v. Johnson*, 25 Cal.3d 932, 950, 160

10  Cal.Rptr. 141 (1979), *overruled on other grounds*, *White*, 21 Cal.4th 563 at 574, n. 4, 88 Cal.Rptr.2d 19;

11  *Kelly-Zurian v. Wohl Shoe Co., Inc.*, 22 Cal.App.4th 397, 420, 27 Cal.Rptr.2d 457, 469 (1994). The

12  critical inquiry whether employees act in a managerial capacity is "the degree of discretion the

13  employees possess in making decisions that will ultimately determine corporate policy." *Egan*, 24

14  Cal.3d at 822-823, 169 Cal.Rptr. 691; *see Kelly-Zurian*, 22 Cal.App.4th at 420, 27 Cal.Rptr.2d at 470

15  (evidence that a supervisor had power to terminate and supervise employee's performance was

16  insufficient to establish managing agent).

17     The California Supreme Court has explained:

18     We therefore conclude that in amending section 3294, subdivision (b), the
Legislature intended that principal liability for punitive damages not depend on
19     employees' managerial level, but on the extent to which they exercise substantial
discretionary authority over decisions that ultimately determine corporate policy. Thus,
20     supervisors who have broad discretionary powers and exercise substantial discretionary
authority in the corporation could be managing agents. Conversely, supervisors who
21     have no discretionary authority over decisions that ultimately determine corporate policy
would not be considered managing agents even though they may have the ability to hire
22     or fire other employees. In order to demonstrate that an employee is a true managing
agent under section 3294, subdivision (b), a plaintiff seeking punitive damages would
23     have to show that the employee exercised substantial discretionary authority over
significant aspects of a corporation's business.

24

25  *White*, 21 Cal.4th at 576-577, 88 Cal.Rptr.2d at 29.

26     A "supervisor must be in a corporate policymaking position in order to be considered a managing

27  agent for purposes of imposing punitive damages liability on the employer." *Myers v. Trendwest*

28  *Resorts, Inc.*, 148 Cal.App.4th 1403, 1437, 56 Cal.Rptr.3d 501 (2007) (critical inquiry is the degree of

1   discretion the employees possess to make decisions that will ultimately determine corporate policy).

2        Defendants argue that Mr. Rheault is not a managing agent although he was the head of the

3   Fresno location of Penske Logistics' Mission Foods account and responsible for its day-to-day

4   operations. Defendants note that Mr. Rheault supervised 25 employees at the Fresno location

5   characterized by defendants as "a very small component of the Penske Logistics enterprise, which

6   employs over 7,000 people throughout the world." Defendants point out that the Fresno location is one

7   of 14 Mission Foods locations and that Mr. Rheault "reported up the corporate ladder to a regional

8   operations manager and/or general manager, who in turn reported to a vice president or senior vice

9   president. Defendant further point to Human Resource Manager Mr. Vicuna's declaration that Mr.

10  Rheault enforced but was not involved in creating Penske Logistics' policies and General Manager Mr.

11  Van Der Stuyf's declaration that Mr. Rheault "played no role" in creating the forklift use statement.

12  Defendants explain that Penske Logistics' human resources department, not Mr. Rheault, was

13  responsible ultimately for termination decisions. Defendants further fault Mr. Fenn's failure to raise a

14  factual issue that Ms. Bach's Human Resources Manager position equated to "corporate policymaking."

15       Mr. Fenn ignores the evidence that Mr. Rheault and Ms. Bach lacked substantial discretionary

16  authority to set Penske Logistics' policy and focus on their alleged wrongs. This Court construes Mr.

17  Fenn's failure to address Mr. Rheault's and Ms. Bach's lack of corporate authority as his concession that

18  they are not managing agents. Mr. Fenn offers nothing to support his notion that "corporate delegated

19  responsibility to Rheault." Moreover, Mr. Rheault's alleged wrongs to terminate Mr. Fenn do not

20  constitute Penske Logistics' policy or a policy established by Mr. Rheault for Penske Logistics.

21       Mr. Fenn faults Ms. Bach's failure "to call Fenn to find out why he was using the forklift."

22  Again, Mr. Fenn focuses on alleged wrongs rather than Ms. Bach's purported status as a managing agent.

23  The record reflects merely that she exercised authority to terminate Mr. Fenn, not that she exercised

24  substantial discretionary authority to set Penske Logistics' policy.

25                                    ***Ratification***

26       Defendants further fault the absence of evidence that a Penske Logistics officer, director or

27  managing agent "had actual knowledge of the alleged discriminatory conduct surrounding Plaintiff's

28  termination."

1    To impose punitive damages on corporate or other large organizations, the malicious, fraudulent

2 or oppressive conduct must have been performed by an agent employed in a "managerial capacity" and

3 acting in the scope of employment, or ratified or approved by a "managerial agent" of the organization.

4 *College Hospital Inc. v. Superior Court*, 8 Cal.4th 704, 723, 34 Cal.Rptr.2d 898 (1994) (citing *Egan*,

5 24 Cal.3d at 822, 169 Cal.Rptr. 691.  "For purposes of determining an employer's liability for punitive

6 damages, ratification generally occurs where, under the particular circumstances, the employer

7 demonstrates an intent to adopt or approve oppressive, fraudulent, or malicious behavior by an employee

8 in the performance of his job duties." *College Hospital*, 8 Cal.4th at 726, 169 Cal.Rptr. 691.  "Corporate

9 ratification in the punitive damages context requires actual knowledge of the conduct and its outrageous

10 nature." *College Hospital*, 8 Cal.4th at 726, 169 Cal.Rptr. 691.

11    Mr. Fenn offers nothing to address whether a Penske Logistics officer, director or managing

12 agent ratified alleged wrongdoing, let alone oppressive, malicious or fraudulent acts.  Defendants are

13 not subject to punitive damages in the absence of factual issues regarding managing agent status or

14 ratification.

15                                **CONCLUSION AND ORDER**

16    For the reasons discussed above, this Court:

17    1.    GRANTS defendants summary judgment;

18    2.    DIRECTS the clerk to enter judgment against plaintiff Norman Fenn, Jr. and in favor of

19          Penske Logistics, LLC and Penske Truck Leasing Co., L.P. and to close this action;

20    3.    VACATES the November 14, 2011 trial; and

21    4.    DISCHARGES Mr. Fenn from this Court's September 13, 2011 order to show cause.

22    IT IS SO ORDERED.

23 **Dated:    September 21, 2011**                _/s/ Lawrence J. O'Neill_
                                                UNITED STATES DISTRICT JUDGE

24

25

26

27

28

27